**ALLIED TECHNOLOGY GROUP, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Monster Government Solutions, LLC, Defendant–Intervenor.**

No. 10–120C.

United States Court of Federal Claims.

Filed Under Seal: May 28, 2010.

Reissued for Publication: July 2, 2010.

Frederick W. Claybrook, with whom were Gunjan R. Talati, James G. Peyster, and Lindsay P. Denault, Crowell & Moring, LLP, Washington, D.C., for Plaintiff.

Micheal N. O'Connell, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

Jacob B. Pan Kowski, with whom were Richard L. Moorhouse, Emily C. Parker, and David P. Goodwin, Greenberg Traurig, LLP, Washington, D.C., for Defendant–Intervenor.

*OPINION AND ORDER* [1]

WHEELER, Judge.

In this post-award bid protest, Plaintiff Allied Technology Group, Inc. ("Allied") challenges the issuance of a Blanket Purchase Agreement ("BPA") by the Department of Justice ("DOJ") to Intervenor, Monster Government Solutions, LLC ("Monster") to provide a web-based, automated recruiting system for DOJ's Justice Management Division and its consortium members. Allied, the incumbent contractor, has provided these services through its General Services Administration ("GSA") Federal Supply Schedule ("FSS") listing since 2001 as the reseller of automated systems developed by Avue Technology Corporation. After evaluating proposals, DOJ selected Monster as the best value offeror. Allied filed a protest at the Government Accountability Office ("GAO") on October 15, 2009, which was denied on January 21, 2010. Allied commenced this action on February 23, 2010.

Allied challenges DOJ's evaluation of proposals, where the Contracting Officer ("CO") disqualified Allied from the competition based upon six exceptions that Allied took to DOJ's Request for Quotation ("RFQ"). Allied alleges that the CO's source selection decision was "fatally flawed," and that his disqualification of Allied was "pretextual," intended only to preclude a later bid protest. (Compl.1.) Allied especially complains about the manner in which the agency performed

1. The Court issued this decision under seal on May 28, 2010 and invited the parties to submit proposed redactions of any competition-sensitive, proprietary, confidential, or other protected information on or before June 9, 2010. By that date, Intervenor Monster Government Solutions requested only minimal redactions of yearly pricing and discount information, while Plaintiff Allied Technology Group, Inc. asked for extensive redactions of proposal and agency evaluation information. In an effort to resolve redaction issues, the Court requested Allied to submit a memorandum explaining the basis for its redactions by June 17, 2010, and afforded Defendant and Monster the opportunity to respond by June 24, 2010. The Court conducted a hearing on July 2, 2010 to consider the proposed redactions. The Court found Allied's proposed redactions to be over-broad.

Allied contends that this procurement may not yet be concluded because it has appealed the Court's decision to the United States Court of Appeals for the Federal Circuit, and if it prevails, one possible outcome may be that the procuring agency will solicit new proposals, or conduct further negotiations, for the contract at issue. Accepting Allied's proposition, the Court does not see how Allied will be harmed by disclosure of the proposal or agency evaluation data in this decision. Many of Allied's proposed redactions come from its subcontractor's Master Subscription Agreement, which is publicly available on the Federal Supply Schedule. If the procuring agency affords Allied another opportunity to compete for the contract, Allied is sure to change its proposal pricing and exceptions that proved fatal the first time. Moreover, if the Court were to accept all of Allied's proposed redactions, it would need to do the same for Monster, resulting in a nearly incomprehensible public document.

The better approach is to honor the "presumption of public access to judicial records." *Baystate Techs., Inc. v. Bowers*, 283 Fed.Appx. 808, 810 (Fed.Cir.2008) (citing *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 9 (1st Cir.1998); *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir.1993)); *see also Madison Servs., Inc. v. United States*, 92 Fed.Cl. 120, 131–33 (2010); *Akal Sec., Inc. v. United States*, 87 Fed.Cl. 311, 314 n. 1 (2009). Thus, the Court has redacted only Allied's and Monster's yearly prices and discount information, which will put Allied and Monster on an equal footing if the agency conducts any recompetition. The redactions are indicated in the decision by brackets and three asterisks, [* * *].

the technical and past performance evaluations. Allied contends that DOJ conducted improper discussions and treated its proposal differently from Monster's proposal, particularly in failing to disqualify Monster for similar non-compliance with the RFQ's requirements. Allied requests declaratory and injunctive relief nullifying the award to Monster.

The Court considered this protest on an expedited basis. Defendant submitted a certified copy of the administrative record on March 1, 2010. Allied filed a motion for judgment on the administrative record and a motion to supplement the administrative record on March 5, 2010. On March 15, 2010, Monster filed its own motion to supplement the administrative record, and Defendant filed a response opposing Allied's motion to supplement. On March 25, 2010, the Court granted in part Allied's motion to supplement the record and denied Monster's similar motion. *Allied Tech. Group, Inc. v. United States,* 92 Fed.Cl. 226, 227 (Fed.Cl.2010). On March 19, 2010, Defendant filed a motion to dismiss Allied's complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Court of Federal Claims ("RCFC") and, in the alternative, its response and cross-motion for judgment on the administrative record. Monster submitted its response and cross-motion on the same date. Allied filed a reply in support of its motion and opposition to the Government's and Monster's cross-motions on March 26, 2010. The Court heard oral argument on the parties' motions on April 14, 2010.

For the reasons stated below, the Court finds that Allied, as the only other offeror in this procurement, has standing to challenge DOJ's contract award to Monster. Were the Court to hold otherwise, in circumstances where there are only two offerors, a procuring agency could insulate itself from review of an improper award simply by disqualifying the losing offeror. Applicable case law precludes such a result. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1334 (Fed.Cir.2001); *Dyonyx, L.P. v. United States,* 83 Fed.Cl. 460, 467–69

(2008). Allied's standing to sue particularly is warranted where the agency evaluated Allied's proposal as if it were eligible for award, and only belatedly declared the proposal unacceptable. Therefore, Defendant's motion to dismiss Allied's complaint for lack of jurisdiction is DENIED.

However, Allied's protest must fail on the merits. In essence, the agency found Allied's technical proposal slightly more favorable than Monster's, but a whopping price difference between the two resulted in the agency selecting the less expensive Monster proposal. Even though price was the least important evaluation criterion, the agency could not justify paying the much higher price offered by Allied. Moreover, Allied's six exceptions to the RFQ cannot be overlooked. To be sure, DOJ did not conduct a flawless procurement, but its award decision has a reasonable basis. The Court cannot say that DOJ's ultimate selection of Monster was arbitrary or capricious, even if the Court itself might have conducted the procurement more in accord with the agency's acquisition plan. *See Holloway & Co. v. United States,* 87 Fed.Cl. 381, 389 (2009) (holding that the Court will not substitute its judgment for the agency's judgment even where the Court would have conducted the procurement differently). In view of the significant price difference and Allied's exceptions to the RFQ, any agency missteps did not prejudice Allied because the agency still would have selected Monster. Accordingly, Allied's motion for judgment on the administrative record is DENIED, and Defendant's and Monster's cross-motions for judgment on the administrative record are GRANTED.

## Background [2]

### A. The Draft Request for Quotations

On August 13, 2008, DOJ issued a draft RFQ for an Automated Integrated Staffing, Recruitment and Position Classification System, or ARS. Administrative Record ("AR") 42a. In basic terms, an ARS is a system that allows the electronic creation of position descriptions, electronic postings of vacancies on USAJOBS, and online, automated submis-

---

**2.** The following factual recitations are drawn from the administrative record of the procure-

ment. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed.Cir.2005).

sion and tracking of employment applications, among other features. AR 51a, 183. DOJ issued the draft RFQ to allow for potential offerors to comment upon DOJ's planned acquisition. AR 42a. While DOJ invited potential offers to submit comments and suggestions on any aspect of the RFQ, DOJ specifically stated that it was looking for comments on sections of the draft RFQ addressing Contract Line Item Numbers ("CLINs"), implementation, training, oral/system presentation, and security requirements. Id. at 42a–43a.

DOJ received comments from three potential offerors, including Allied and Monster. See AR 87–175. Monster provided DOJ with comments pertaining to CLINs, security, and system requirements contained in the draft RFQ. Monster suggested, for example, that the draft RFQ's list of functional requirements limited a potential offeror's ability to provide alternate means of achieving similar results or better outcomes. AR 127. Additionally, Monster suggested that DOJ incorporate a minimum guaranteed quantity in the CLINs. AR 124. Allied also provided comments to DOJ, including a four-page section entitled "Comments for DOJ on Contractual/Legal Matters." AR 152. Allied noted that some of the terms and conditions listed in the draft RFQ potentially conflicted with Allied's Master Subscription Agreement ("MSA") used in other government contracts. Id. Allied commented upon a provision of the draft RFQ requiring offerors to highlight any provisions of their offer that may conflict with the terms of the RFQ. AR 154. Specifically, Allied observed that any conflicting provisions may be considered exceptions or may result in a potential proposal being found non-responsive. Id.

### B. DOJ's Formal RFQ

After revising the draft RFQ to incorporate some of the suggestions it received, DOJ issued RFQ No. DJJV–09–RFQ–0543 ("RFQ" or "Solicitation") on March 2, 2009 seeking technical and price quotations to fulfill its requirements for an ARS system. AR 177. The Solicitation stated that DOJ primarily intended to procure an ARS that would support the DOJ Personnel Office, and adhere to all DOJ security requirements. AR 182. A second purpose of the acquisition was to have a contract vehicle in place that other sub-agencies within DOJ could use to acquire the same system. Id.

The Solicitation sought an ARS with "innovation and expanded/enhanced system functionality and technology to support human capital and human resources (HR) business processes and operations." AR 183. Specifically, the Solicitation called for the installation of an "effective user-friendly web-based application" for approximately 11,000 employees that initially would be covered by the system, including 24 system administrators. Id. This number was expected to increase as additional DOJ sub-agencies implemented the new system. AR 183. DOJ further required a product that could interface with DOJ's "payroll/personnel system[,] internal Department/Component systems, and provide data feeds to external systems." Id.

Consistent with its Acquisition Plan, DOJ informed offerors that the BPA would contain firm fixed price CLINs for a one-year base period and four one-year options. AR 3, 177. The Solicitation indicated that DOJ intended to issue a minimum of one task order annually, but with no minimum guarantee. AR 177. The Solicitation also called for a commercial-off-the-shelf product available on the FSS. AR 178. Accordingly, the RFQ informed offerors that DOJ would conduct the procurement under the Federal Acquisition Regulation ("FAR") Subpart 8.4 [3] and only those companies with existing listings for ARS products on the FSS would be eligible to compete. Id.

The Solicitation is divided into four sections, labeled as "documents." "Document A" contains the cover letter to the RFQ and general background information relating to the procurement. AR 177–78. "Document B" includes the BPA terms and conditions, the Statement of Work ("SOW"), and a list of 114 technical requirements. AR 179–228.

---

**3.** FAR Subpart 8.4 contains regulations for FSS acquisitions and provides federal agencies with a simplified process for obtaining commercial supplies and services at prices associated with volume buying. See 48 C.F.R. (FAR) 8.402 (2009).

"Document C" includes quote instructions, AR 229–35, and "Document D" provides a general description of the evaluation factors and the source selection process, AR 236–38.

Some of the Solicitation's terms and conditions have become points of contention in this protest. One such term is Section 8 of the RFQ, entitled "Confidentiality of Data." AR 187–88. This clause states that the contractor must agree to maintain the confidentiality of all data to which access may be gained throughout contract performance. *Id.* Similarly, under Section 8, the contractor must agree that upon termination of the contract, it will not have any property or possessory rights to any correspondence, files, or materials in connection with the performance of the contract. *Id.* The language of this provision is the same as the "Confidentiality of Data" provision in the draft RFQ. AR 56a–57a, 187–88. Section 12 of the terms and conditions, entitled "Governments Rights in Data Produced Under This Contract," also is substantially similar to the draft RFQ provision. AR 58a–59a, 189–90. However, in the formal RFQ, DOJ added subparagraph (f) explicitly incorporating FAR 52.227–14 to state that the "Government shall have unlimited rights . . . in all computer software, documentation, and other data developed by the Contractor under this BPA." AR 189–90, subparas. (a), (f).

Section 15 of the terms and conditions requires invoices to be "submitted monthly for payment in arrears." AR 191. This Section notes that in the event of an inconsistency between the provisions of the BPA and the contractor's invoice, "the provisions of this BPA shall take precedence." *Id.* The language of this Section is identical to the "Invoices" Section of the draft RFQ. *See* AR 60a, 191. Section 18, entitled "Order of Precedence," also contains similar language to the draft RFQ. This Section provides that "[i]n the event of an inconsistency between the provisions of the BPA and any order issued hereunder or any invoice from the Contractor, the provisions of the BPA will take precedence." AR 204.

Finally, Section 13 states that the contractor is obligated to comply with Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(d). AR 190. Section 508 of the Rehabilitation Act requires federal agencies to make electronic and information technology accessible to people with disabilities. *Id.* Section 508 also is a high priority technical requirement in the Requirements List attached to Document B of the RFQ. *See* AR 305.

As noted, DOJ recognized that conflicts or disagreements may exist between the RFQ terms and the contract terms that are part of the prospective offeror's FSS listing. AR 232, 294. Part 4 of the Quote Instructions attached as Document C states that offerors must highlight any provisions that conflict with the RFQ's terms and conditions for DOJ's review. *Id.* Part 4 emphasizes that conflicting provisions will be considered exceptions to the terms and conditions of the RFQ. *Id.* The Solicitation added language not included in the draft RFQ noting that any conflicting provisions that cannot be resolved may result in an offeror being removed from consideration for the contract. *Id.* Part 5 of the Quote Instructions also warns offerors that "any exceptions taken to the terms and conditions of the RFQ may adversely impact [their] rating." *Id.*

### C. *Evaluation Factors*

The Evaluation Factors and Source Selection Process included in "Document D" of the RFQ contains certain criteria that offerors must meet to be considered for award. AR 236. As a preliminary matter, the eligibility requirements provide that "an Offeror must propose all services necessary to meet the requirements of the RFQ and receive a favorable assessment of national security risk . . . ." *Id.*

In addition to the general eligibility requirements, Document D contains the evaluation criteria by which the agency would review and rate the offerors. The evaluation factors in order of importance are: (1) Technical Merit; (2) Oral/System Presentation; (3) Past Performance; and (4) Price. AR 236–37. The Solicitation required offerors' proposals to include price and technical components, each in separate volumes. AR 229. The Government then would award a BPA "to the Offeror whose quote represent[ed]

the best value to the Government...." *Id.* Although the work would be competed on a best-value basis, DOJ was "willing to pay a premium for a proposal with a greater technical rating." AR 4.

1. *Technical Merit Factor*

Under the RFQ, offerors could earn a total of 60 points for Technical Merit based upon the following three sub-factors: (1) Understanding of the Requirements (25 points); (2) Customer Service (25 points); and (3) System Upgrades (10 points). AR 236–37. Sub-factor one refers to a "Requirements List" attached to Document B which details 114 functional, technical, and service requirements that each offeror was expected to meet. AR 209–25, 236. Each of the 114 requirements was marked as "High," "Medium," or "Low" priority. AR 209–25; 298–316. One of the "High" priority technical requirements includes installing an ARS that uses unique employee identifiers in lieu of social security numbers or other personally identifiable information. AR 312. Another high priority requirement pertains to training DOJ employees on how to use the ARS. For example, under Requirements 62 and 63, training must be centrally located "throughout the geographic locations covered by the contract" and "presented in various media" such as satellite television broadcasts and video conferencing. AR 303.

The Solicitation instructed offerors to check either "Yes" or "No" for each requirement indicating their ability to meet that requirement by the end of the 60 to 90–day transition period. AR 184, 236. A requirement marked as "High" must be available upon completion of the transition period, while requirements marked as "Medium" must be available within twelve months of contract award. AR 184. Failure to meet all "High" or "Medium" priority requirements by the stated time periods could result in DOJ unilaterally cancelling the BPA at no cost to the Government. *Id.*

The evaluation of the Understanding of the Requirements sub-factor included each offeror's ability to "understand ... the Government's [114] functional, technical and security requirements." AR 231. Specifically, the Solicitation required offerors to demonstrate that they had "the technical expertise and existing infrastructure to handle an effort of this size and complexity...." AR 231. DOJ also would evaluate an offeror's proposed transition plan to begin service and to continue month-to-month service, if needed, at the end of the BPA. AR 231, 236.

The evaluation of the Customer Service sub-factor included an offeror's customer service plan and considered how the plan would "respond to Government questions and requests." AR 236–37. The Solicitation explained that offerors would be evaluated based on their logical support plans and "proven devotion to customer service." AR 237. Finally, under the third sub-factor, Systems Upgrades, DOJ would evaluate an offeror's "proposed commitment to the continual improvement of its automated recruiting system" and "any examples given of previous upgrades placing its system ahead of its competitors." *Id.*

Each point given per sub-factor corresponded with an adjectival rating of excellent, good, satisfactory, poor, or unacceptable. *See, e.g.,* AR 835, 838, 841. For example, obtaining 22–25 points for the first sub-factor, "Understanding of the Requirements," equated to an adjectival rating of "Excellent." AR 835. On the other hand, receiving 0–9 points for the first sub-factor corresponded to an "Unacceptable" rating. *Id.* The same point range applied to the second sub-factor, also worth up to 25 points. *See* AR 838. Because the last sub-factor for "System Upgrades" was worth only 10 points, an offeror receiving 9–10 points obtained an "Excellent" rating, while 0–2 points was considered "Unacceptable." AR 841.

2. *Live System Demonstration Factor*

The Live System Demonstration factor constituted a possible 30 points in the overall evaluation. AR 237. DOJ invited each offeror to give a maximum three-hour demonstration, which it would evaluate on the "user-friendliness of the system, including how many screens users need to navigate through and if the set-up of the screens is intuitive." *Id.* DOJ required offerors to

demonstrate: (1) the steps for Human Resources ("HR") personnel to follow in posting a vacancy; (2) the steps for an applicant to follow in responding to a job vacancy; (3) the process the automated system would use to evaluate and rank applicants; (4) the steps for HR personnel to review applicants; (5) the steps for managers to review and make a selection; and (6) the steps for HR personnel to close the job vacancy. AR 234. DOJ would assign each of the six steps of the system demonstration a score based on the following three sub-factors, with each step worth up to five points: (1) navigational capability; (2) flow of information; and (3) look and feel. AR 810, 856.

Under the Navigational Capability sub-factor, the Technical Evaluation Panel ("TEP") would consider whether the "site allow[ed] for clear and intuitive navigation through the different screens." AR 860. That is, if an ARS user wanted to return or proceed to a separate screen, the TEP would consider whether that function was clearly described and easy to use. Id. Similarly, under the Flow of Information sub-factor, the TEP would evaluate whether the ARS site presented a "common sense sequence of information to complete tasks" and whether the user ever had to duplicate information. Id. Finally, under the Look and Feel sub-factor, the TEP considered whether various screens were laid out in a way that displayed "the most pertinent information" and allowed for "an intuitive understanding" of how to complete a task. Id.

Like the Technical Merit factor, each point given for an offeror's live system demonstration corresponded with an adjectival rating. See, e.g., AR 856. However, the live system demonstration employed the following definitions to rate the offerors' ARS demonstrations:

| Ratings | Definition |
| --- | --- |
| Excellent | The system far exceeds Government requirements. The system has major strengths which indicate exceptional features or innovations that will substantially benefit the Government. There are no major weaknesses, and any minor weaknesses are insignificant when compared to the strengths. |
| Good | The system exceeds the Government requirements. The system has major strengths and/or several minor strengths which will benefit the Government. There are some weaknesses, but they are more than offset by strengths. |
| Satisfactory | The system meets the Government requirements. The system performance is generally adequate, and possesses a similar number of weaknesses and strengths. |
| Poor | The system does not meet some of the Government requirements. The system has major weaknesses and/or several minor weaknesses that are only partially offset by strengths. |
| Unacceptable | The system does not meet many of the Government requirements. The system reflects a superficial, incomplete or incorrect understanding of the Government's needs. There are major weaknesses and no significant strengths to offset them. |

AR 860. Thus, if a live demonstration received five points under the navigational capability sub-factor for posting a job vacancy, that offeror would receive an adjectival rating of "Excellent" for that factor. Similarly, if the "look and feel" of an HR manager review receives four points, an offeror would receive a "Good" adjectival rating for that factor.

3. *Past Performance*

Past performance accounts for the final 10 percent of the non-price portion of the evaluation. AR 237. DOJ required each offeror to describe its experience during the past three years "in performing implementation of automated recruiting systems of similar size, complexity and scope either with other Government agencies or in the public sector." AR 231, 293. Each offeror also was required

to submit five references for "similar efforts which are in progress or were completed within the past three (3) years." AR 231–32, 293–94. The Solicitation indicated that DOJ would make a reasonable effort to contact each of the offeror's references and inquire about "1) the quality and timeliness of the Offeror's work, 2) the Offeror's ability to estimate costs accurately and to stay within budget, and 3) the Offeror's business behavior and commitment to customer satisfaction." AR 237.

### 4. *Price*

Under the fourth evaluation criterion, offerors were to submit firm fixed price quotations for the base year and four option years. AR 295. While adhering to the firm fixed price obligation, the Solicitation required offerors to identify any proposed discounts from its standard GSA pricing. AR 233. DOJ then would determine whether "the total evaluated price [was] consistent with the Offeror's GSA pricing and any proposed discounts." AR 237.

The Solicitation also includes 24 separate CLINs for which offerors were to provide prices. AR 181, 254. CLIN 001 consisted of costs to transition from the ARS currently used by DOJ to a new contractor's system, if necessary. AR 181, 254. CLINs 002–0023 represented the cost of various ranges of users. *Id.* For example, CLIN 002 was for annual ARS services for 5,000–10,000 employees, while CLIN 0023 was for annual ARS service for 110,001–115,000 employees. AR 254. CLIN 0024 represented the "monthly transition price" if month-to-month ARS services were needed for up to six months following the end of the BPA. AR 255. The CO later amended the RFQ to clarify that pricing for CLIN 0024 would be "determined based upon the employee range CLIN being utilized at the end of Option Year 4." *Id.* According to the amended RFQ, the monthly cost for the transition period would be one-twelfth of the annual cost of the CLIN the agency then was utilizing. *Id.*

Overall, DOJ considered the non-price factors, when combined, to be significantly more important than price. AR 237. However, "[t]he total evaluated price w[ould] be the determining factor for award where two or more quotes [were] considered substantially technically equal." AR 238.

### C. *Evaluation Process/Basis for Award*

The Solicitation provides that "the Government will award a BPA resulting from this RFQ to the Offeror whose quote represents the best value to the Government after evaluation...." AR 229, 291. To be considered acceptable, an offeror's quote must meet the "total requirement and scope stated in the RFQ and ... accept each of the requirements, provisions, terms and conditions, and clauses stated in all sections of this RFQ." *Id.* Additionally, the Solicitation states:

> The Government intends to make an award on the basis of initial quotations without the use of discussions. Offerors should therefore submit their most advantageous quote in response to the initial solicitation. However, the Government reserves the right to use discussions after receipt of quotations if it is considered in the Government's best interests to do so.

AR 238. The Solicitation also notes that DOJ "reserves the right to conduct discussions if later determined by the CO to be necessary." AR 229, 291.

Although the Solicitation does not outline fully the mechanisms for conducting the evaluation, the CO drafted an internal Proposal Evaluation Plan ("PEP") setting forth the manner in which the source selection would be accomplished and the procedures by which the evaluation would be conducted. *See* AR 13–41. Pursuant to the PEP, the CO serves multiple functions in the source selection process. In addition to being an advisor to the TEP, the CO would be responsible for evaluating offerors' business and price proposals and conducting the past performance reference checks. AR 15, 18. The CO also would determine which offerors are the "most highly rated and capable offerors," and ultimately would be the final source selection official. AR 15.

The PEP provides that an evaluation team would comprise of a TEP and a Business Evaluation Panel ("BEP"). *Id.* While the CO would serve as the sole member of the BEP,

the TEP would consist of the CO's Technical Representative and additional representatives. *Id.* Together, the CO and the TEP would be responsible for "the entire selection process." *Id.*

According to the PEP, the first step in the source selection process was for TEP members to assess individually each offeror's capabilities based upon a review of the technical quotations. AR 17. In addition to a narrative assessment of each factor, the TEP was to prepare an overall assessment for each technical evaluation factor and assign a rating to each factor. AR 18. After conducting the individual evaluations, the TEP was to draft collectively a Technical Evaluation Report ("TER"). *Id.* The TER was to identify any quotations that failed to meet the mandatory RFQ requirements. It also was to include a ranking of quotations in conformance with the weighted evaluation scores, which are computed by multiplying the rating assigned by the TEP for each factor by the weight for that factor. *Id.* The TER was to reflect the collective views of the panel in a narrative assessment for all offerors, and include the identified "Strengths, Weaknesses, and Risks of each offeror relative to each Technical Evaluation Factor." *Id.*

While TEP members were to evaluate the offerors' technical quotations, the PEP instructs the CO to review the offerors' business and price quotations to determine whether they are compliant with the RFQ requirements. *Id.* Specifically, the CO would be responsible for conducting past performance reference checks, and determining the average rating for a given reference. AR 18–19. Additionally, the CO would assess each offeror's compliance with the firm fixed price requirements of the RFQ. AR 19. The PEP instructs the CO to include the results of the reference checks in the TER and also to draft a Business Evaluation Report ("BER") detailing whether the offers comply with the RFQ requirements. *Id.*

The PEP required the CO to incorporate the results of the two reports into a Source Selection Recommendation ("SSR") report. *Id.* The SSR report would include an explanation of any proposals that failed to meet the mandatory RFQ requirements and were found unacceptable. *Id.* Like the TER, the SSR report also would include a ranking of proposals in conformance with the weighted evaluation scores, including the past performance scores. Finally, the SSR report would identify "the single offeror that in the view of the TER represents the best value to the Department," describing how and why a particular offeror was selected for recommendation and "what benefits it provides to the Government." *Id.* Based upon the contents of the SSR report, the CO was to prepare a source selection decision identifying which offeror would receive the award. AR 20.

### D. *Submission of Proposals*

DOJ solicited four sources to submit quotations for an ARS: Monster, Allied/Avue, and two others. AR 1036. After issuing the formal RFQ on March 2, 2009, DOJ received additional questions regarding the content of the Solicitation. *Id.* One of Monster's questions led DOJ to revise the RFQ and include additional language describing a front-end Personnel Action Request ("PAR") system, which serves to accommodate automatically requests for personnel actions. *Id.;* AR 183, ¶ 2.4. DOJ also received requests to provide further guidance on the proper interpretation of CLIN 0024. After issuing the revised RFQ, DOJ received quotations from Monster and Allied respectively, by the April 30, 2009 extended closing date. AR 321, 583. DOJ evaluated Monster's and Allied's prices by using CLIN 003, 10,001–15,000 users, representing the level of usage DOJ then was experiencing. AR 182, 255.

Monster proposed an externally-hosted ARS solution and represented that it was able to meet all 114 Requirements contained in Document B of the RFQ. AR 515, 518–22, 531–35. For CLIN 003, Monster's price was $3,204,351 for the anticipated five-year period, including first-year transition costs of [* * *]. AR 1038.

| Monster's CLIN 003 Pricing | |
| --- | --- |
| Year | Price |
| Base | [* * *] |

| | |
|---|---|
| Option Year 1 | [* * *] |
| Option Year 2 | [* * *] |
| Option Year 3 | [* * *] |
| Option Year 4 | [* * *] |
| TOTAL | $3,204,351 |

AR 327, 1038. In accordance with the RFQ, Monster proposed discounts from its standard FSS pricing of between [* * *] and [* * *] percent. AR 328. Monster filled in CLIN 0024 as "n/a" for monthly transition costs, based upon the agency's amendment of the RFQ. AR 255, 327.

Allied also proposed an externally-hosted ARS solution using Avue Digital Services and represented that it would meet all of the functional, technical, and security requirements contained in the RFQ. AR 586–605, 621–30. Allied's offer used an "all you can eat" pricing methodology, meaning that Avue would support unlimited use by the client organization and its employees as well as external users such as applicants. AR 587. Thus, Avue would not assess fees on a "per-seat, per-server, per-transaction, or professional service fee basis." *Id.* Allied submitted a CLIN 003 price of $7,000,486 for the anticipated five-year period. AR 592–96. Thus, Allied's pricing for the initial 15,000 employees expected to use the ARS system was as follows:

| Allied's CLIN 003 Pricing With Annual Prepayment Discount | |
|---|---|
| Year | Price |
| Base | [* * *] |
| Option Year 1 | [* * *] |
| Option Year 2 | [* * *] |
| Option Year 3 | [* * *] |
| Option Year 4 | [* * *] |
| TOTAL | $7,000,486 |

AR 592, 1017–1021. Allied's pricing assumed that DOJ would take advantage of a [* * *] percent subscription prepayment discount from its FSS pricing. AR 592, 588. Without accepting the prepayment discount and using the monthly installment payment method specified in the RFQ, Allied's pricing for the five-year BPA for CLIN 003 was even higher:

| Allied's CLIN 003 Pricing With Monthly Payments | |
|---|---|
| Year | Price |
| Base | [* * *] |
| Option Year 1 | [* * *] |
| Option Year 2 | [* * *] |
| Option Year 3 | [* * *] |
| Option Year 4 | [* * *] |
| TOTAL | $11,698,107 |

AR 1026.

Both offerors identified exceptions to the requirements of the RFQ. Monster noted its exceptions in Part 5 of the Technical Quote portion of its proposal. AR 547–52. Monster first stated that its ARS system, "Hiring Management–Employer 5.0" had minor compliance exceptions to the Section 508 RFQ requirement with regard to the "accessibility of forms, text equivalents for non-text elements, and keyboard accessibility." AR 547. However, Monster included as "Exhibit A" to Part 5 of its Technical Quote the Section 508 Compliance Certification form stating that its quote was compliant with Electronic and Information Technology Accessibility Standards. AR 548–50.

Based upon language in Monster's pricing quote, the CO contacted Monster by e-mail regarding its pricing. AR 1029–30. The CO first noted that Monster did not address CLIN 0024 and inquired whether Monster would allow the Government to extend the contract, if awarded to Monster, on a monthly basis at a cost of one-twelfth the appropriate CLIN. AR 1029. The CO then noted that Monster's quote had omitted pricing for "Organization and Change Management, Expunge/Delete Services." *Id.* The CO inquired whether Monster would need to perform such services to meet the RFQ's requirements. *Id.* The CO informed Monster that the e-mail was "not a request for a revision" and that "the Government w[ould] not accept a revised quote." *Id.* Monster confirmed that: (1) it would allow the Government to extend the BPA on a monthly basis at a cost of one-twelfth of the

appropriate full-time equivalent CLIN as required in the RFQ; (2) its proposed pricing included all of the requirements contained in the RFQ; and (3) its proposed pricing included a standard security package that meets all of the RFQ requirements. AR 1031–32.

Allied identified differences between the RFQ's requirements and its MSA. AR 809. In its exceptions sheet, Allied first noted that Avue's MSA from the FSS contract would take precedence over all other agreements or terms and conditions. AR 587, 809. Therefore, a direct conflict existed with the RFQ's Order of Precedence clause at Section 18, which stated that the Solicitation would take precedence in any conflict. AR 204, 277–78. In particular, Allied identified four other areas where its MSA precedence could lead to exceptions to the RFQ's terms and conditions. The first of these exceptions concerned Sections 8 and 12 of the RFQ's terms and conditions, where Allied stated that Avue's MSA should take precedence over both RFQ sections. AR 260–61, 262–63, 809. Allied also took exception to Section 15 requiring invoicing monthly in arrears. AR 264, 809. Allied's price was based on an annual prepayment of the ARS services being procured and its exception noted that the RFQ's "Invoices" clause was "contrary to both the Avue MSA and the Federal Supply Schedule." AR 809; see also AR 587–88. Finally, Allied took exception to the RFQ's Inspection and Acceptance clause and proposed that it should be subject to the terms in Avue's MSA. AR 280, 809. Each term that Allied identified as an exception was consistent with the incumbent contract in place with DOJ for the previous eight years. See AR 152, 587; Compl. 2.

The CO also contacted Allied by e-mail regarding its price quotation. AR 1023. The CO sought clarification on Allied's prepayment discount pricing and inquired whether Allied was conditioning its offer on DOJ's agreement to pay in advance. DOJ similarly requested Allied's pricing should DOJ elect not to pre-pay. Id. Like the e-mail to Monster, the CO noted that his inquiry was "not a request for a revision" and that the "Government w[ould] not accept a re-vised price quote." Id. In response, Allied explained that DOJ was not obligated under Allied's proposal to accept the prepayment discount and provided alternate pricing, noting that it would be 30 percent higher than the pricing included in its proposal. AR 1024–25. Allied also reminded DOJ that it had uniformly taken the prepayment discount in prior years. Id.

E. Evaluation of Proposals

1. Technical Evaluation

DOJ selected seven persons to serve on the TEP; however, only four of the seven TEP members participated in both the technical evaluation and the live system demonstration. AR 832. The members of the TEP who performed the technical evaluation analyzed both offerors' quotations using the point system set forth in the RFQ. Based on their initial evaluations, the TEP members completed score sheets, which instructed them to identify significant strengths and weaknesses for each sub-factor under the Technical Merit factor. See, e.g., AR 834–37; see also AR 856–59. Each TEP member then gave point scores for each sub-factor ranging from "Excellent" to "Unacceptable." AR 834–41. While the PEP calls for the TEP members to draft an evaluation report representing their consensus findings, AR 18, it appears from the administrative record that the TEP did not prepare an evaluation report. Nevertheless, after the TEP members submitted their initial evaluations, the CO reviewed and returned the evaluations seeking additional comments and descriptions to support their respective ratings. See, e.g., AR 877.

After a review of the offerors' technical quotations, five of the seven members of the TEP attended the offerors' live system demonstrations and completed live system demonstration evaluations. The CO also sent out past performance questionnaires to the offerors' listed references. AR 814–25; see also AR 1038. Since DOJ had ample experience using Avue's ARS, members of the TEP with personal knowledge were asked to submit comments to the CO regarding Avue's past performance. AR 1038. References for both offerors were positive, and when aver-

aged, Monster received a past performance rating of 9.79 out of 10, and Allied received a rating of 9.5. AR 1015, 1038.

Following a review of the TEP's evaluation sheets, the CO averaged the TEP's ratings to determine an overall technical rating for each offeror. AR 1002–16. The following chart shows the final technical evaluation scores, including past performance:

| Evaluation Factor | Allied/Avue | Monster |
|---|---|---|
| 1–Technical Merit | 51.1 | 46.2 |
| 2–System Demonstration | 22.9 | 23.5 |
| 3–Past Performance | 9.5 | 9.79 |
| TOTAL | 83.5 | 79.49 |

AR 1016.

### 2. *Price Evaluation*

The PEP calls for the CO to conduct a price evaluation. AR 18–19. Accordingly, the CO evaluated the full range of costs across all years for all CLINs, comparing the prices as stated in the offerors' quotations to determine the differences. *See* AR 1017–21. The administrative record, however, contains no evidence that the CO also drafted a BER memorializing his assessment of each offeror's proposal, as provided in the PEP.

### 3. *The CO's Determination*

On August 2, 2009, the CO issued his source selection decision choosing Monster as the awardee. The CO noted that he found Monster to represent "the best value to the Department." AR 1033. He stated that while the technical evaluation resulted in a "very slightly higher" technical rating for Allied, "Monster proposed a far lower overall price." *Id.*

The CO issued a memorandum on September 29, 2009 entitled "Acquisition Summary" detailing his analysis of the offerors' proposals. AR 1034–44. The CO highlighted Avue's standard FSS termination provision and Allied's exceptions, and opined that these objections to the RFQ amounted to "a refusal by Allied/Avue to accept material requirements, provisions, terms and conditions and clauses to the RFQ, and result in Allied/Avue's quote being unacceptable from a business standpoint." AR 1037. In contrast, the CO found Monster's quotation acceptable, reasoning that "Monster agreed to the Terms and Conditions laid out in the solicitation." AR 1039. While the CO considered Allied's technical proposal to be unacceptable due to the exceptions, the CO stated that he evaluated both offerors' business and price quotations because Allied was the only other competitor to submit a quote. AR 1037.

In justifying his determination to award the contract to Monster, the CO stated that while Allied's technical score was 5.04 percent higher than Monster's, the difference only amounted to "a small technical advantage for Allied/Avue, ... mak[ing] the pricing evaluation ... a major factor." AR 1038. The CO further noted that the Government would save $3,796,135 if DOJ selected Monster over Allied based on the CLIN 003 level of up to 15,000 ARS users. *Id.* The savings would increase if additional sub-agencies joined the BPA and raised the user level. *Id.* The CO thus concluded that "even if Allied/Avue's business proposal was acceptable, which it is not, Monster still presents the best value to the Department." AR 1039.

On September 30, 2009, the CO notified Allied of the award to Monster. AR 1045. The CO also prepared an "Evaluation for Basis of Award" memorandum that he provided to Allied. AR 1046. In the memorandum, the CO informed Allied that because it had taken exceptions to material terms and conditions of the Solicitation, he "deemed Allied/Avue's offer to be unacceptable." AR 1046. The memorandum also informed Allied that, in the interest of competition, the CO performed a full evaluation of its proposal, and based on the technical evaluation and price of the proposals, he concluded that the "slight technical advantage the Allied/Avue proposal would give the Government could not justify the large disparity in price that would accompany it." *Id.*

Allied submitted questions to the CO regarding his determination and requested, among other things, identification of the terms and conditions that DOJ found unacceptable. AR 1047. On October 9, 2009, the CO responded by e-mail identifying the specific terms and conditions. *Id.* The CO noted

that, while Allied's exceptions were "seen as a refusal to accept material terms and conditions of the BPA," Allied's exceptions to the terms and conditions of the RFQ were not reflected in the actual numerical technical score. Thus, the CO informed Allied that its exceptions "did not reduce Allied/Avue's technical score and were not the ultimate basis for the award decision." *Id.*

### F. *Allied's GAO Protest*

Allied protested DOJ's award decision to the GAO on October 15, 2009. The GAO denied the protest on January 21, 2010. AR 1049. The GAO rejected Allied's assertions that the DOJ improperly conducted discussions with Monster and held that the agency properly limited its communications with Monster to clarifications. AR 1052. The GAO also determined that the agency reasonably found Allied's proposal to be unacceptable given that Allied took exceptions to material terms and conditions of the Solicitation. AR 1056–57. Regarding Allied's assertion that the CO did not have the discretion to disqualify Allied without notice or discussion, the GAO held that the Solicitation provisions adequately notified vendors of the risks of taking exceptions to the RFQ terms and conditions, "including the possibility of being found unacceptable without discussion." AR 1057. Similarly, the GAO noted that to the extent the phrase "cannot be resolved" in the RFQ may be interpreted as mandating discussions, in direct conflict to the Solicitation provision stating that selection would be made without discussions, "such a patent ambiguity" required Allied to seek clarification prior to the closing date for submission of quotations in order to be considered timely. *Id.* at n. 10.

The GAO also found reasonable DOJ's determination that Monster's quotation was acceptable, notwithstanding its exceptions. AR 1059. The GAO reasoned that Monster's quotation was "generally compliant" and thus it found no merit in Allied's argument that Monster's minor compliance exceptions to the Section 508 requirements or its collection of social security numbers "mandated a determination of unacceptability." *Id.* Finally, GAO determined that Allied was not an in-

terested party to protest other aspects of Monster's quotation and subsequent aspects of the source selection decision. AR 1059–60.

### G. *Allied's Action in This Court*

Allied filed a seven-count complaint in this Court on February 23, 2010, more than one month after GAO had denied Allied's protest. Allied alleges that DOJ improperly and unreasonably disqualified Allied for taking exceptions to the RFQ. (Compl. 28–29.) Specifically, Allied asserts that its disqualification was pretextual, "only announced as a potential hedge to a bid protest action." *Id.* at 29. Allied also argues that DOJ improperly failed to disqualify Monster for taking exceptions to the Section 508 requirements and the firm fixed price pricing requirements for "train-the-trainer" training, and for collecting social security numbers in direct conflict with the Requirements of the RFQ. *Id.* at 30–31. Additionally, Allied points to the TEP's technical evaluation and the CO's past performance evaluation, claiming that both were done arbitrarily, thus prejudicing Allied's chances for award. *Id.* at 31–32. Allied argues that the CO failed to conduct a lowest overall cost analysis, *id.* at 32, and treated the offerors unequally by engaging in discussions with Monster and disqualifying Allied for its stated exceptions to the RFQ terms, among other actions, *id.* at 33–34. Allied also alleges that the CO conducted a defective best value tradeoff analysis and failed to document his evaluation and tradeoff decision adequately. *Id.* at 34–36. Allied requests declaratory and injunctive relief prohibiting DOJ from allowing Monster to begin performance under this contested award. *Id.* at 37. The case is before the Court for decision on Defendant's motion to dismiss and on the parties' cross-motions for judgment on the administrative record.

### Standards for Decision

### A. *Standard for Judgment on the Administrative Record*

██ The Federal Circuit explained in *Bannum, Inc. v. United States* that the standard applicable to a motion for judgment on the administrative record differs from a motion for summary judgment. 404 F.3d at

1355–57. Under RCFC 52.1, the Court reviews a motion for judgment on the administrative record to determine whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *DMS All–Star Joint Venture v. United States*, 90 Fed.Cl. 653, 661 (2010) (citing *Bannum, Inc.*, 404 F.3d at 1355–56). In other words, the inquiry in a review of the administrative record in a bid protest is whether "a protestor has met its burden of proof that an award is arbitrary, capricious ... or violates to prejudicial effect an applicable procurement regulation." *Tech. Sys., Inc. v. United States*, 50 Fed.Cl. 216, 222 (2001). Resolving cross-motions for judgment under RCFC 52.1 is "akin to an expedited trial on 'the paper record.' " *CHE Consulting, Inc. v. United States*, 78 Fed.Cl. 380, 387 (2007) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed.Cl. 126, 131 (2006)). The Court may make findings of fact where necessary. *Bannum, Inc.*, 404 F.3d at 1356.

B. *Standard of Review in Bid Protests*

 This Court reviews an agency's decision pursuant to the standard set forth in the Administrative Procedures Act ("APA"). 5 U.S.C. § 701–706 (2000); *see also Impresa*, 238 F.3d at 1332; *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed.Cl. 350, 358 (2004). Under the APA, a reviewing court will set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir.2000) (citation omitted)). Thus, in a bid protest, a procurement decision may be set aside if the decision lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa*, 238 F.3d at 1333.

 In this case, Allied argues that DOJ's award decision lacked a rational basis and therefore was unlawful. Where a procurement is challenged on this ground, plaintiff bears the burden of showing that the award decision had no rational basis. *Impre-*

*sa*, 238 F.3d at 1332. An agency's decision is considered arbitrary and capricious if "the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made." *Great Lakes Dredge & Dock Co.*, 60 Fed.Cl. at 358 (citing *Antarctic Support Assoc. v. United States*, 46 Fed.Cl. 145, 154 (2000) (citation omitted)). This standard of review is "highly deferential," *Advanced Data Concepts, Inc.*, 216 F.3d at 1058, and entitles the agency's decision to a "presumption of regularity." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed.Cir. 2001). Thus, the Court may not " 'substitute its judgment for that of the agency if the agency's decision is reasonable.' " *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 735 (2007) (citation omitted). An agency's decision may be upheld, even if the Court may have "interpreted and applied the procurement regulations in a different fashion had the court been in the agency's position." *Holloway*, 87 Fed.Cl. at 389; *see also Lumetra v. United States*, 84 Fed.Cl. 542, 549 (2008); *Great Lakes Dredge & Dock Co.*, 60 Fed.Cl. at 359. Where the contract is awarded on a "best value basis," as in this case, the procurement official is afforded "even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

 Although the arbitrary and capricious standard is highly deferential, "it is not a rubber stamp." *Overstreet Elec. Co. v. United States*, 47 Fed.Cl. 728, 742 (2000) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir.1995)). This standard of review does not require the Court "to accept ... bald assertions on a critical point that are not otherwise tied to the administrative record and that are at least in tension with, if not contradicted by, various aspects of that record." *Id.* Legal arguments for agency action must be supported by the record and

"after-the-fact rationalizations should be rejected." *Great Lakes Dredge & Dock Co.*, 60 Fed.Cl. at 358. Thus, a careful review of the record is required to ensure the procurement official's decision had a rational basis or did not involve a violation of regulation or procedure. *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed.Cir.2009). Where the Court determines that "the [G]overnment acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct." *Bannum, Inc.*, 404 F.3d at 1351. The plaintiff bears the burden of establishing prejudice by showing that there was a substantial chance that it would have received the contract award but for the procurement error of the agency. *Id.* at 1353.

### C. *Motion to Dismiss for Lack of Jurisdiction*

 The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12(a)-(b) (1996), confers upon this Court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals . . . or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In this case, the Government challenges the Court's jurisdiction to entertain Allied's claims. (Def.'s Mot. 1–2.) When considering a motion to dismiss pursuant to RCFC 12(b)(1), the Court must "presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of plaintiff." *A & D Fire Prot., Inc.*, 72 Fed.Cl. at 131 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Reynolds*, 846 F.2d at 748; *Cubic Def. Sys., Inc. v. United States*, 45 Fed.Cl. 239, 245 (1999) (citing *Cedars-*

*Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir.1993)). If the Court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. *A & D Fire Prot., Inc.*, 72 Fed.Cl. at 131.

### *Discussion*

### A. *Standing*

 Standing is a jurisdictional issue and the party invoking federal jurisdiction bears the burden of establishing by a preponderance of the evidence that it has standing to pursue its claims. *United Enter. & Assoc. v. United States*, 70 Fed.Cl. 1, 18 (2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Myers Investigative & Sec. Serv., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed.Cir.2002). Under 28 U.S.C. § 1491(b), only interested parties have standing to protest a contract award in this Court. "Interested parties" are "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Amer. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001). Allied therefore must satisfy a two-part burden to demonstrate that it has standing to assert its claims: (1) that it was an actual or prospective bidder; and (2) that it possesses "direct economic interest." *Dyonyx*, 83 Fed.Cl. at 465 (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed.Cir.2006)).

 To possess "direct economic interest," Allied must demonstrate that it was prejudiced in the procurement process. *Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."); *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir. 2003) (noting that the question of prejudice goes directly to the question of standing). That is, Allied must show that "but for the error, it would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed.Cir.2009). However, not every error necessarily is harmful. *Id.* at 1380. Only when an unsuccessful bidder can show

that the Government's error caused it to "suffer disparate treatment or particularized harm" does it have standing to sue. *Id.*

■■■ The Government asserts that Allied lacks standing to protest the issuance of the BPA to Monster. (Def.'s Mot. 22–27.) Defendant argues that, because the CO found Allied's quote unacceptable due to the exceptions it took to material terms and conditions of the RFQ, Allied cannot challenge DOJ's determination that its quotation was non-compliant and that Monster's quotation was acceptable. *Id.* at 27, 32. However, Defendant's contention that standing is a function of a quotation's acceptability misconstrues established case law. The Federal Circuit has made clear that the focus of a standing inquiry is whether an actual or prospective bidder had a "substantial chance" of receiving the award. *Impresa*, 238 F.3d at 1334. It is beyond dispute that Allied was an actual bidder in this case. Indeed, the CO decided to evaluate the merits of Allied's quotation—notwithstanding its alleged unacceptability—because "only one other competitor submitted a quote." AR 1037. Thus, given the circumstances, the test is whether Allied has a direct economic interest in the resolution of the protest.

■■■ Our Court has held that the prejudice requirement for standing is less stringent than that required for success on the merits. *See Dyonyx*, 83 Fed.Cl. at 465–66, n. 2. The prejudice requirement for standing is satisfied by a "nominal showing that a protestor 'could compete for the contract.' " *Id.* (quoting *Myers*, 275 F.3d at 1370); *see also Textron, Inc. v. United States*, 74 Fed.Cl. 277, 284 (2006); *Global Computer Enter., Inc. v. United States*, 88 Fed.Cl. 350, 401 (2009) ("A prejudice determination for the purpose of evaluating standing is a 'limited review' that seeks 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.' ") (citation omitted). Thus, a protestor has standing where it can demonstrate that absent the error, it would have had a substantial chance of receiving a contract award or would have been "within the zone of active consideration." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999)

(citing *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1574–75 (Fed.Cir.1983)); *see also Info. Sci. Corp. v. United States*, 73 Fed.Cl. 70, 94 (2006). The Federal Circuit has found that a protestor has standing where the protestor's quotation would be next in line for selection if its protest were sustained. *See Galen Med. Assoc., Inc.*, 369 F.3d at 1331 (holding that a disappointed bidder had standing to bring a bid protest, where it finished second to the contract awardee and thus had a substantial chance of receiving the award); *Impresa*, 238 F.3d at 1334 ("[I]f the [plaintiff's] bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and [plaintiff] could compete for the contract once again."). Here, if the Court finds that Monster should have been disqualified and not Allied, Allied would be next in line to receive the award because it was the only other offeror considered for the BPA. Additionally, if the Court finds that both Allied and Monster were ineligible for award, DOJ would be obligated to resolicit the contract and Allied could compete for the contract again. Under either of these circumstances, the Court finds that Allied had a "substantial chance" of receiving the award, and thus has standing. *See Info. Sci. Corp.*, 73 Fed.Cl. at 94–95.

The Government's assertion that standing necessarily is linked to an offeror's technical acceptability produces an illogical result of potentially insulating from review an agency's decision to declare one proposal acceptable and another unacceptable. If the Court were to accept the Government's position, a procurement official could preclude any review of a competitive award involving two offerors simply by finding the losing offeror ineligible for award. Such a position is contrary to established case law and has been rejected both in the Federal Circuit and this Court. *See Rex Serv. Corp.*, 448 F.3d at 1307–08; *Impresa*, 238 F.3d at 1334; *Dyonyx*, 83 Fed.Cl. at 460 ("The Government originally made the senseless jurisdictional argument that an agency arbitrarily can declare a protested proposal to be nonconforming, while accepting the awardee's allegedly

nonconforming proposal, and thereby preclude the protestor from standing to challenge the award."). The Court therefore finds that Allied has the necessary standing to proceed with its protest. The Court will address below the merits of Allied's claims.

## B. The Disqualification of Allied's Proposal Was Reasonable.

Allied contends that DOJ should not have disqualified its proposal as being unacceptable. It argues that the agency unreasonably classified some of Allied's quotation terms as "exceptions," and lacked any discretion to disqualify Allied without first engaging in discussions. (Pl.'s Mot. 33–36). Allied further contends that the CO disqualified its quotation as a potential hedge against a possible bid protest action. *Id.* at 31, 33. For the reasons stated below, the Court finds Allied's arguments unavailing.

### 1. Classifying Allied's Terms as Exceptions

 Allied does not dispute that its quotation took exception to some of the RFQ's terms and conditions. *See* Compl. 12–13 ("Derivative of its exception to the RFQ's Order of Precedence Clause ... Allied identified four other areas in which its MSA precedence might lead to exceptions to the RFQ's stated terms and conditions."); Pl.'s Mot. 14–15 (same). However, Allied now argues that two of the exceptions identified by the CO actually were not exceptions at all. (Pl.'s Mot. 36; Pl.'s Reply 10–11.) Allied first points to its prepayment term, claiming that it was not an exception, but rather a price discount that the Government was not obligated to accept. (Pl.'s Reply 11.) Second, Allied suggests that Avue's MSA data rights clause was "consistent in spirit" with the RFQ's Rights in Data provision and thus, the CO improperly classified it as an exception. (Pl.'s Mot. 36, n. 3; Pl.'s Reply 11.)

Allied's claims are contradicted by the administrative record. Most telling is Part 5 of

Allied's technical proposal entitled "Exceptions." AR 809. Part 5 states that the "Avue Platform requires that the Avue MSA ... take [ ] precedence over all other agreements/terms and conditions across our entire client base." *Id.* Additionally, Part 5 lists five exceptions to the RFQ's terms and conditions, including Section 15 which requires invoices to be submitted monthly for payment in arrears, and Section 12 which gives the Government unlimited rights in data developed by the contractor. AR 189, 191. Allied's quotation states that Section 15 of the RFQ is "contrary to both the Avue MSA and the Federal Supply Schedule, and *needs to be removed.*" *Id.* (emphasis added). Allied's offer similarly notes that Section 12 of the RFQ "needs to be subject to the MSA...." AR 809.

Other portions of Allied's quotation similarly contradict its position. Allied's offer provides that "[e]ach client is governed by the same Master Subscription Agreement terms that provide Avue with the consistency that is *mandatory* in order to generate the tremendous cost savings Avue achieves for its clients." AR 725 (emphasis added). Moreover, Allied's quotation states:

> [T]his proposal expressly assumes that the client will join the rest of Avue's subscribers and accept the terms and conditions of the Master Subscription Agreement, with the MSA included in the contract award, and the MSA will be given the first order of precedence so as *to prevail over any contrary terms contained in the contracting documents.*

*Id.* (emphasis added). The plain language of Allied's quotation makes clear that Allied conditioned its offer on the Government's acceptance and adherence to Avue's MSA, including invoices for payments in advance and data rights. Where Allied's quotation terms were in direct conflict to the terms and conditions of the RFQ, the CO reasonably identified such terms as exceptions.[4]

---

4. Allied acknowledged in its reply brief that it took exception to the RFQ's Invoice and Data Rights clauses. *See* Pl.'s Reply 11. Allied nonetheless maintains that DOJ was not obligated to pay in advance and that Avue's MSA was "con-

sistent in spirit" with the RFQ's Rights in Data provision. *Id.* Even if these assertions were true, the CO still acted reasonably in classifying Allied's prepayment and data rights statements as exceptions to the RFQ.

### 2. Discussions as a Prerequisite to Disqualification

■■■■ Allied next argues that the CO unfairly disqualified it because the RFQ required DOJ first to engage in discussions with offerors regarding any exceptions that "cannot be resolved." (Pl.'s Mot. 33–35; Pl.'s Reply 5–8.) The interpretation of a contract is a question of law for the Court to decide. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985). Applying the general rules of contract construction, the Court begins with the plain language of the contract. *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed.Cir.1997); *C.R. Pittman Constr. Co. v. United States*, 92 Fed.Cl. 20, 24–25 (Fed.Cl. 2010). The Court "must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *United Int'l Investigative Serv.*, 109 F.3d at 737 (quoting *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed.Cir. 1992)).

■■■■ The Solicitation's evaluation criteria provided that "the Government intend[ed] to make an award on the basis of initial quotations without the use of discussions." AR 238. Accordingly, the Solicitation advised offerors to "submit their most advantageous quote in response to the initial [S]olicitation." *Id.* As DOJ would evaluate quotations on a best value basis, the RFQ again instructed offerors that their "initial offers shall contain the Offeror's best offer from a technical and price standpoint." AR 229.

Part 4 of the RFQ's Quote Instructions required offerors to highlight any provisions in their quotations that conflict with the terms and conditions of the RFQ. AR 232. DOJ warned offerors that "[c]onflicting provisions will be considered as exceptions to the Terms and Conditions of the RFQ," and that "[a]ny Terms and Conditions ... considered unacceptable by the Government and cannot be resolved may result in the Offeror being removed from consideration." *Id.* Part 5 of the RFQ's Quote Instructions similarly provides that "any exceptions taken to the terms and conditions of the RFQ may adversely impact its evaluation rating." *Id.*

While the Government reserved the right to conduct discussions, the Solicitation stated that DOJ would do so only if deemed necessary by the CO or if it was in the Government's best interest. AR 229, 238. Accordingly, the RFQ required offerors to identify in their quotations individuals with the authority to speak on behalf of their companies in the event discussions ensued. AR 233.

Allied reads these RFQ provisions to suggest that DOJ could not render Allied's quotation unacceptable unless and until it held discussions. (Pl.'s Mot. 30–35.) Reading the RFQ in its entirety, the Court cannot agree. The RFQ, on at least two occasions, advised offerors to submit their most advantageous offers in their initial quotations. *See, e.g.,* AR 229, 238. The Solicitation further makes clear that DOJ intended to award the contract based on offerors' initial quotations without holding discussions. *See* AR 238. While the Solicitation states that the CO may engage in discussions or negotiations, the RFQ emphasizes that the CO would do so only when it is was in the Government's best interest. AR 229, 238. Accepting Allied's interpretation that discussions were mandatory conflicts with DOJ's stated intent to award the BPA based on initial offers without engaging in discussions. Allied interprets too narrowly the RFQ provisions on which it relies, without taking into account the RFQ as a whole.

The Court notes that Allied knew full well that taking exceptions to the Solicitation could result in the CO rendering its quotation unacceptable. In response to the draft RFQ, Allied commented that the RFQ language "suggests that an offeror runs the risk of a proposal being found non-responsive if any terms in an offeror's standard MSA or SLA are highlighted as directed." AR 154. The formal RFQ, apparently in response to Allied's comment, added a new provision advising offerors that unacceptable quotations could be removed from consideration. Allied argues that the phrase "cannot be resolved" means that any unacceptable terms must be discussed with the offeror. (Pl.'s Mot. 35.) However, Allied's emphasis on this single phrase ignores the remainder of the RFQ. Contrary to Allied's interpretation, the RFQ,

read as a whole, does not suggest that offerors are guaranteed discussions to "resolve" unacceptable terms and conditions. Rather, the Solicitation adequately notified offerors of the risks of taking exceptions, including being affected adversely in the evaluation or being found unacceptable.

 Allied also cannot take solace from the fact that DOJ and other government agencies have accepted Allied's similar exceptions in years past. Previous acceptance of terms does not obligate the Government to continue to accept similar terms later. *See, e.g., Intown Properties, Inc.,* B–250392, 93–1 CPD ¶ 73, at 5 n. 2, 1993 WL 25123, at *4 (Comp.Gen. Jan.28, 1993). Allied made a business decision to adhere to the provisions of its MSA and to take exception to various terms and conditions in the RFQ, knowing that its quotation could be held unacceptable as a result. Having taken that risk and lost, Allied now cannot avoid the plain language of the RFQ to support its claim.

### 3. *The CO's Disqualification of Allied's Quotation Was Not "Pretextual."*

Allied argues that the CO's disqualification of its quotation as unacceptable was a pretext to defend against a potential protest. (Pl.'s Mot. 31–33.) The Court finds no merit in this assertion.

 An offeror's proposal must conform to the terms of the Solicitation. *Centech Group, Inc.,* 554 F.3d at 1037. To be considered acceptable, "a proposal must represent an offer to provide the exact thing called for ... so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." *Id.* (citing *E.W. Bliss Co.,* 77 F.3d at 448). Where a proposal fails to conform to the material terms and conditions of a solicitation, the proposal "should be considered unacceptable ..." *E.W. Bliss Co.,* 77 F.3d at 448 (citation omitted); *see also Mantech Telecomm. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 71 (2001) ("It is fundamental that a materially noncompliant proposal cannot be the basis of an award."). A solicitation term is considered material "where it has more than a negligible impact on price, quantity, quality, or delivery of the subject of the [RFQ]." *Blackwater Lodge & Training Ctr. v. United States,* 86 Fed.Cl. 488, 505 (2009). However, if a defect in a proposal is trivial or negligible, the proposal need not "be rejected out of hand." *M.W. Kellogg Co./Siciliana Appalti Costruzioni v. United States,* 10 Cl.Ct. 17, 26 (1986); *see also Tel–Instrument Elec. Corp. v. United States,* 56 Fed.Cl. 174, 176 (2003) (noting that material requirements are not minor informalities). Thus, the Court only will overturn an agency's determination that an offeror's proposal failed to satisfy the material requirements of the solicitation if such a finding was arbitrary and capricious. *Blackwater,* 86 Fed.Cl. at 506.

 Allied took six exceptions to the RFQ's terms and conditions, including the Order of Precedence clause, the Confidentiality of Data clause, the Government Rights in Data Produced Under the Contract clause, the Invoices and Termination clauses, and the Inspection and Acceptance provision. *See* AR 1037. The CO found these exceptions material because they affected the price and the delivery of the services requested in the Solicitation. *Id.* The CO's determination was not unreasonable. Taking Allied's invoice exception as an example, Allied conditioned the Government's acceptance of its offer on its MSA agreement, which requires annual payment in advance. AR 588. Should the Government reject Allied's invoice exception, Allied would impose a steep premium, and would refuse a refund to the Government if it terminates the contract. AR 1024–26. It thus is beyond debate that Allied's alternate payment proposal materially affected its pricing. The CO did not abuse his discretion in finding that Allied's invoice exception was material.

Allied's other exceptions also were material. Avue's MSA provided, for example, that Allied would own everything not considered "Client Data" or "Government Data." AR 729. By contrast, the RFQ provided that "[a]ll data and information developed by ... entered into and processed through the contractor's information system(s) under this BPA shall be considered government property." AR 189. Thus, under Avue's MSA, the

Government could lose rights to property such as position descriptions processed through Avue's system that it otherwise would own under the terms of the RFQ. This exception materially affects the quality or delivery of the automated system the Government expected to receive. *See Tel–Instrument Elec. Corp.,* 56 Fed.Cl. at 178 (holding that a bid limiting data rights and conditioning payment terms is non-responsive because it modifies the legal obligations of the parties). Having fully considered the nature and extent of the exceptions included in Allied's quotations, the CO reasonably determined that the exceptions represented a refusal by Allied to accept material terms of the RFQ, and therefore, Allied's quotation was unacceptable. Contrary to Allied's assertions, the CO's determination was not arbitrary and capricious, and therefore, the Court will not disturb it.

■■■■ The Court similarly finds no evidence to support Allied's assertions that the CO's determination was an "after-the-fact" rationalization or a pretext in anticipation of a potential protest. *See* Pl.'s Mot. 30. The CO's decision to disqualify Allied's quotation because of its exceptions was not arbitrary or capricious. The CO thus needed no pretext to find Allied's quotation unacceptable. Moreover, assertions of pretextual disqualification are tantamount to accusations of bad faith. *See Savantage Fin. Serv., Inc. v. United States,* 595 F.3d 1282, 1288 (Fed.Cir. 2010) (finding no support for plaintiff's argument that the Government's requirements constituted a pretextual attempt to circumvent an earlier injunction); *Bean Stuyvesant, LLC v. United States,* 48 Fed.Cl. 303, 320 (2000) ("[There exists a] strong presumption that government officials act correctly, honestly, and in good faith when considering bids.") (citation omitted). To support its claim, Allied must demonstrate by clear and convincing evidence allegations of pretext or bad faith. *Galen Med. Assoc., Inc.,* 369 F.3d at 1336; *see also Klinge Corp. v. United States,* 87 Fed.Cl. 473, 479–80 (2009) ("[P]retext or bad faith requires more than mere error."); *Carahsoft Tech. Corp. v. United States,* 86 Fed.Cl. 325, 337 (2009) (noting that protestor must prove by clear and convincing

evidence allegations of pretext or bad faith). Allied fails to meet this burden.

■■■■ Allied makes much of the fact that the CO did not follow the procedures in the PEP to document "[a]ny issues of noncompliance" prior to issuing his source selection decision. *See* Pl.'s Reply 2–5. The language in the PEP does not contain any strict time limits obligating the CO to document immediately his assessment of offers. Further, the PEP is an internal government document and this Court consistently has held that source selection plans and other internal documents are guidelines that do not give any rights to offerors. *Manson Constr. Co. v. United States,* 79 Fed.Cl. 16, 19 (2007) ("Internal agency documents that are not distributed as part of a solicitation do not themselves confer rights to potential offerors."); *ManTech Telecomm.,* 49 Fed.Cl. at 67 (noting that a source selection plan, not included in the Solicitation, incorporated by reference, or made known to the offerors until after final bids were submitted, gives no rights to outside parties); *Delta Dental of Cal.,* B–296307, 2005 CPD ¶ 152, 2005 WL 1994327, at *1 (Comp.Gen. Jul. 28, 2005) (same). Thus, DOJ's failure to follow the PEP did not render its evaluation of Allied's proposal arbitrary, capricious, or pretextual. Moreover, Allied's claims deal with the "timing of various steps in [a] procurement" and "involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.,* 77 F.3d at 449. The Court declines to set aside the CO's disqualification of Allied as being pretextual or conducted in bad faith.

### C. *DOJ's Evaluation of Monster's Proposal Was Reasonable.*

Allied argues that DOJ acted arbitrarily and capriciously by awarding the BPA to Monster because Monster's quotation allegedly failed to comply with some of the material requirements in the Solicitation. Allied specifically contends that: (1) Monster's quotation took exception to the RFQ's Section 508 terms and conditions; (2) Monster's training pricing converted its quotation into a level-of-effort offer; and (3) Monster's ARS requires use of applicant social security num-

bers, in direct conflict with the terms of the RFQ. (Pl.'s Mot. 37–48.) As explained below, the Court finds that these protest grounds are without merit.

### 1. The Section 508 Requirements

■ Allied asserts that Monster failed to comply with Section 508 of the Rehabilitation Act. (Pl.'s Mot. 37–38.) Allied points to a provision in Monster's offer which states that its system has "minor compliance exceptions with the accessibility of forms, text equivalents for non-text elements, and keyboard accessibility." AR 547. Allied argues that compliance with Section 508 is required by statute, the FAR, and the RFQ, and taking exception to Section 508 runs "afoul both of one of the RFQ's terms and conditions and of federal law, rendering Monster's proposal unawardable." (Pl.'s Mot. 37.) The Court disagrees.

The RFQ required offerors to certify whether, and to what extent, their products complied with Section 508. AR 190, 226–28. Monster's quotation included the required Compliance Certification and provided further that, based upon an independent audit, its ARS product, Hiring Management (HM)-Employer 5.0, was "generally compliant" with the Section 508 requirements. AR 547. While Monster identified "minor exceptions" to these requirements, this Court has held that trivial or negligible defects do not render a quotation unacceptable. *M.W. Kellogg Co.*, 10 Cl.Ct. at 26. The Court finds no basis to conclude that Monster's minor exceptions to Section 508 rendered its quotation unacceptable. The fact that DOJ found Monster's quotation acceptable, notwithstanding the minor exceptions to Section 508, was not arbitrary or capricious.

■ Even if DOJ erred in selecting an offeror who did not comply with a material Solicitation requirement, Allied has failed to show that it suffered any prejudice as a result. Allied's own quotation failed to include the mandatory Section 508 Compliance Certification, and Allied did not state that its product had been audited by an outside auditor for Section 508 compliance, as the RFQ required. Moreover, the CO reviewed and evaluated both Allied's and Monster's techni-

cal quotations despite their respective deficiencies in fully complying with the Solicitation's Section 508 requirements. *See Labatt Food Service, Inc.*, 577 F.3d at 1381 (finding no prejudice where the procurement official improperly deviated from the solicitation and permitted all offerors to submit proposal revisions by e-mail). Allied therefore cannot show that it suffered any prejudice from the CO's assessment that both quotations generally were compliant with Section 508.

### 2. Monster's Train–the–Trainer Pricing

■ Allied also argues that Monster's price quotation attempted to place a limitation on how many training sessions Monster would provide under the Solicitation. (Pl.'s Mot. 40–43.) Allied specifically contends that Monster's quotation limited its pricing to train only 50 students and thus its quotation deviated from the Solicitation's pricing framework and should have been rejected as unacceptable. *Id.* at 41–43.

One of the requirements listed in the Solicitation is for offerors to provide training or "train-the-trainer sessions" to DOJ. AR 257. In response to a pre-proposal question, DOJ specified that it would require training for at least 50 trainers initially and that for each CLIN increase of 5,000 employees, an additional 25 trainers would require training. AR 284. Taking into account this requirement, the RFQ instructed offerors to submit quotations with firm fixed prices for each CLIN. AR 177. Specifically, the Solicitation called for offerors to break down their costs and "show all charges that comprise the Firm Fixed Price," and to "set forth any assumptions used in the development of its pricing." AR 295.

Monster submitted firm fixed prices for each CLIN as required. AR 327. Monster's quotation provided that it would provide training to "all employees that require training for the life of the contract." AR 328. Monster also reiterated that the pricing table enclosed in its quotation was firm and fixed. AR 328–29. Based on this information, DOJ had no reason to question Monster's representation that it was committed to providing

the training DOJ required at a firm fixed price.

Allied suggests that Monster's price quotation limited Monster's obligation to provide training to 50 students in the base year and 25 students thereafter. (Pl.'s Mot. 41–43.) Allied apparently takes issue with Monster using as its basic price term the Government's estimation that it initially would require 50 trainers. *Id.* at 41–42. Allied, once again, is off base. The fact that Monster submitted its pricing quotation based on the Government's initial training estimates does not convert Monster's stated fixed price quotation to level-of-effort pricing, especially taking into account other language in its quotation. What is more, to the extent there were any discrepancies and ambiguities in Monster's price quotation, the Federal Circuit has held such discrepancies do not warrant disqualification. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1564 (Fed.Cir.1996) ("We know of no principle or precedent ... that requires or even suggests disqualifying an otherwise qualified bidder because of inconsistencies in its quoted prices."). Accordingly, the Court finds that the CO acted rationally in not disqualifying Monster's quotation on this basis.

### 3. *Social Security Numbers*

 Allied contends that Monster's quotation should have been rendered unacceptable because Monster failed to comply with the RFQ requirement prohibiting the use of social security numbers. (Pl.'s Mot. 46–48.) Requirement 107 of the RFQ provides that "[t]he system shall use unique employee identifiers in lieu of social security numbers or other personally identifiable information." AR 312. In its technical proposal, Monster stated that its system complied with this requirement. AR 539. Allied, however, asserts that Monster's system is tied to USA-JOBS which requires applicants to furnish their social security numbers. (Pl.'s Mot. 46.) Allied argues that, by requiring applicants to provide their social security numbers, Monster took exception to a technical requirement of the RFQ, thereby rendering its quotation ineligible for award. *Id.*

Allied reads Requirement 107 too narrowly. When read in its entirety, the Solicitation simply prohibited offerors from using applicants' social security numbers or personally identifiable information as unique employee identifiers. *See* AR 312. Contrary to Allied's assertion, the provision does not prohibit an offeror's system from asking or collecting social security numbers or other personally identifiable information. Allied's reliance on previous security breaches by Monster.com similarly is misplaced. (Pl.'s Mot. 47–48.) As Monster noted during oral argument, the security breaches referenced by the technical evaluation panel concerned Monster.com, an entity separate and distinct from the awardee of this BPA, Monster Government Solutions. AR 1157–71; *see also Allied Tech.Group, Inc. v. United States*, 10–120C, Hr'g Tr. 41–42; 54–56, Apr. 14, 2010. Monster certified that it would not use social security numbers or other personally identifiable information, and DOJ had no reason to question Monster's representation. The Court therefore will not set aside DOJ's decision to accept Monster's quotation as compliant with this requirement.

### D. *The Contracting Officer Did Not Engage in Discussions.*

Allied argues that DOJ treated Allied and Monster differently by conducting discussions with Monster and allowing it to amend its quotation, without affording Allied the same opportunity. (Pl.'s Mot. 66–70.) Allied specifically takes issue with two questions the CO posed to Monster concerning its pricing. *Id.*

As requested in the RFQ, Monster included firm fixed prices for CLINs 002–0023 in its proposal, but marked CLIN 0024 as "n/a." AR 327. Monster also stated in its quotation that "[p]ricing does not include Organization and Change Management, Expunge/Delete Services, as well as establishment of Dedicated Environments, which will need to be separately scoped and priced." AR 328. Following receipt of quotations, the CO contacted Monster by e-mail inquiring whether Monster would allow the Government to extend the contract, if awarded to Monster, on a monthly basis at a cost of one-twelfth of the

appropriate CLIN. AR 1029. The CO similarly inquired whether the Expunge/Delete services discussed in Monster's quotation were necessary for Monster to provide ARS services to the Government. *Id.* DOJ informed Monster that it would not accept revised quotations. *Id.*

In response to the Government's inquiry, Monster confirmed that it would allow transition costs at one-twelfth of the appropriate CLIN as stated in the RFQ. AR 1031. Monster similarly informed the CO that the Expunge/Delete services were not required for Monster to perform work under the BPA and requested the CO to "strike this ... language from ... its Price Quote to the Government." *Id.* Allied argues that both of the Government's questions to Monster were discussions, and not clarifications, allowing Monster to revise its quotation without affording Allied the opportunity to do the same. (Pl.'s Mot. 66–70.) DOJ argues that the exchanges at issue constituted clarifications and that the Government was not obligated to engage in discussions with Allied. (Def.'s Mot. 49–54.)

The Court notes that while FAR Subpart 8.4 governs the Solicitation, DOJ also incorporated certain procedures found in FAR Part 15, including best value determinations and the use of discussions, if necessary. *See* AR 229–38. The Court consistently has held that procurements conducted under Subpart 8.4 are different from those conducted under Part 15, even if "some procedures also present in Part 15 are utilized." *Sys. Plus, Inc. v. United States*, 68 Fed.Cl. 206, 211 (2005); *Ellsworth Assoc., Inc. v. United States*, 45 Fed.Cl. 388, 395 (1999) ("Plaintiff's proposition that Part 15 standards must be imported into an FSS procurement ... amounts to an unwarranted embellishment of the decisional law."); *Holloway*, 87 Fed.Cl. at 393 ("Competitive procedures have been classified into specific subtypes, of which competitive proposals are one and FSS contracts are another."); *Unisys Corp. v. United States*, 89 Fed.Cl. 126, 140 (2009) ("FAR 8.404(a) specifically states that FAR Part 15 does not apply to such [FSS] procurements."). Where a solicitation governed by FAR Subpart 8.4 uses procedures found in FAR Part 15, the procurement official need not comply with "the more formal and rigorous procedures for negotiated procurements." *Holloway*, 87 Fed.Cl. at 393; *see also Sys. Plus, Inc.*, 68 Fed.Cl. at 210 ("[W]hile the agency can elect to use procedures from these other parts [of the FAR], they are not presumptively applicable."). Thus, to prevail in a bid protest for a solicitation conducted under FAR Subpart 8.4, a protestor must demonstrate that the agency's procedures were arbitrary and capricious. *Ellsworth*, 45 Fed.Cl. at 395–96. The Court will overturn an agency's action only where it violated the fundamental fairness of the procurement process. *Unisys Corp.*, 89 Fed.Cl. at 140. This requires, under the FAR, that "all contractors .... be treated fairly and impartially, but need not be treated the same." *Id.* (citing FAR 1.102–2(c)(3)).

Although not directly applicable to this procurement, FAR Part 15 sets forth the definition for discussions and clarifications, relevant to the resolution of Allied's claim. Under the regulation, "discussions" involve "negotiations" and "are undertaken with the intent of allowing the offeror to revise its proposal." FAR 15.306(d). Discussions occur when the agency indicates to an offeror "significant weaknesses, deficiencies, and other aspects of its proposal that could be altered or explained to materially enhance the proposal's potential for award." *Career Training Concepts, Inc.*, 83 Fed.Cl. at 230. On the other hand, "clarifications" are defined as "limited exchanges between the Government and offerors, that may occur when *award without discussions is contemplated.*" FAR 15.306(a) (emphasis added). *See generally Info. Tech.*, 316 F.3d at 1320 (providing an analysis of clarifications and discussions). The actions of the parties, not the characterization by the agency, determine whether discussions have been held. *Career Training Concepts, Inc.*, 83 Fed.Cl. at 230. Thus, "the acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for proposals to be revised or modified." *Id.*

In this case, the Court finds no merit to Allied's argument that the CO engaged

in discussions with Monster. Regarding CLIN 0024, offerors were not required to submit a price because the RFQ already established that pricing for CLIN 0024 would be determined based on one-twelfth the annual cost of the CLIN being utilized by DOJ. AR 1054. Indeed, as the Government pointed out during oral argument, Monster could not provide pricing for CLIN 0024 because it has no basis to know what CLIN the Government would be using in the future. *See* Hr'g Tr. 53–54. Moreover, nothing in the Solicitation expressly required offerors to provide numerical data for CLIN 0024. Monster confirmed in its proposal that its prices for CLINs 002–0023 were firm and fixed and it provided no revisions to its quotations when responding to the CO's inquiry. As such, the Court finds that the CO's exchange with Monster regarding CLIN 0024 did not constitute discussions. *See Info. Tech.*, 316 F.3d at 1323 (holding that communications between the agency and the offeror were not discussions because the offeror was not given the opportunity to revise its proposal).

The Court similarly finds that the CO's exchanges with Monster concerning its Expunge/Delete Services simply were clarifications. In response to the CO's inquiry regarding whether Expunge/Delete services were required, Monster stated such services would not be necessary for it to fulfill the contract. AR 1031. Monster additionally noted that it included all of its pricing for the services DOJ requested in the Solicitation. *Id.* Monster provided no revisions or changes to its pricing in light of the CO's inquiry. Allied makes much of the fact that Monster requested DOJ to strike the Expunge/Delete Services language from its price quote. (Pl.'s Mot. 69.) The Court finds no merit to Allied's argument that this request turned the CO's clarifications into discussions. Even if Monster's request to strike language allowed it to revise its quotation—which it did not—Allied failed to prove Monster's quotation was revised in a material way. *See Career Training Concepts, Inc.*, 83 Fed.Cl. at 230–31. Accordingly, the Court concludes that the CO's exchanges with Monster were clarifications and that the CO had no obligation to engage in discussions with Allied.

### E. DOJ's Technical and Past Performance Evaluation

Allied next contends that DOJ's technical evaluation of its quotation was prejudicial. (Pl.'s Mot. 48–63.) Allied first states that DOJ failed to develop a common scoring system which resulted in inconsistencies in the TEP's evaluation of its proposal. *Id.* at 48–51. Allied argues that the technical scoring is unsupported because the CO intervened in the TEP's process and failed to create a consensus report as called for in the PEP. *Id.* at 51, 70–74; Pl.'s Reply 29–35, 40–41. Allied also contends that DOJ's past performance evaluation was flawed because the CO failed to take into account a number of security breaches that allegedly occurred with Monster's job application software. *Id.* at 60–63. According to Allied, DOJ's errors in conducting the technical and past performance evaluations were arbitrary and capricious and highly prejudicial. *Id.* at 51–59, 63.

#### 1. Allied Cannot Show Prejudice From DOJ's Technical Evaluation.

The Court agrees with Allied's assertion that there were errors in DOJ's technical evaluation process. As previously discussed, TEP members used score sheets to evaluate offerors' technical proposals on a point system with adjectival ratings. For example, factor one, Technical Merit, provided for ratings of 52–60 (excellent), 43–51 (good), 34–42 (satisfactory), 25–33 (poor), and 0–24 (unacceptable), while sub-factor one, Understanding of the Requirements, provided for ratings of 22–25 (excellent), 18–21 (good), 14–17 (satisfactory), 10–13 (poor), and 0–9 (unacceptable). *See, e.g.,* AR 834–35. The score sheets identified how the point system relates to the adjectival ratings, but the score sheets failed to indicate how scores should be tabulated. Indeed, the score sheets do not instruct TEP members how to assign points, how the number or extent of the significant strengths should correspond to total points, or what constituted a "perfect" score. *Id.* More importantly, DOJ left the adjectival ratings for the Technical Merit sub-factors undefined. *Id.* Lacking a defined scoring system, the TEP's ratings varied significantly by individual. For example, four of the six evaluators

found Allied's technical quotation to be superior, while two evaluators found Monster's quotation to be superior by a large margin. *See* AR 834–999.

In addition to the disparate scoring, the Court found a number of inconsistencies in the written portion of the TEP's technical evaluation. For example, TEP members assigned significant weaknesses to Allied for failing to discuss certain factors, which Allied actually included in its offer. *See, e.g.,* AR 854, 610, 734. Some evaluators also marked both "significant strength" and "significant weakness" for the same proposal feature in the same sub-factor. One evaluator identified Avue's Concierge Service as a "significant strength," AR 850, but then assigned Allied a "significant weakness" for the same feature, AR 851. Also, it appears that evaluators credited Monster with "significant strengths" for ARS system features for which Allied was not similarly credited. In sub-factor three, one evaluator gave Monster a "significant strength" for "undergoing a series of upgrades throughout the course of a year," AR 841–42, without giving Allied the same credit, despite having the same feature in its quotation.

The Court also found questionable the CO's communications with TEP members following receipt of their initial evaluations. AR 827–32, 896–900, 949–50, 985. The CO asked four TEP members to provide more detail explaining why they assigned Monster a low score. *See, e.g.,* AR 985. In response to the CO's inquiries, two TEP members altered their scores to give Monster higher, or even perfect scores, for three different sub-factors. *See* AR 838, 841, 931. Allied also received less than perfect scores in certain factors, but the administrative record lacks any evidence that the CO questioned TEP members about their evaluations of Allied. *See, e.g.,* 909–11, 943–44.

 Despite the errors in DOJ's technical evaluation, Allied fails to meet its burden of demonstrating that DOJ's actions prejudiced it. To prevail in a bid protest, a plaintiff must do more than merely demonstrate an error on the part of the Government. *See Labatt Food Serv., Inc.,* 577 F.3d at 1380; *Galen Med. Assoc., Inc.,* 369 F.3d at

1330 (" '[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.' " (quoting *Data Gen. Corp.,* 78 F.3d at 1562)). Rather, Allied also must show that "there was a substantial chance it would have received the contract award but for [the CO's] error." *Alfa Laval Separation, Inc.,* 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)). Thus, a procurement official's decision must be sufficiently serious to cause prejudice to a protestor in the procurement. *See E.W. Bliss Co.,* 77 F.3d at 448–49.

 In this case, given the substantial difference between Allied's and Monster's price quotations, Allied cannot reasonably show that it would have received the award in the absence of DOJ's errors. For evaluation purposes, the CO used CLIN 003 for 10,0001 to 15,000 ARS users to compare Monster's and Allied's pricing, using the prepayment discount Allied proposed in its quotation. AR 1038. At that CLIN level, Monster's price for the full five-year term of the contract, including transition costs as a non-incumbent contractor, was \$3,204,351. *Id.* Allied's price at the same CLIN level, without transition costs, was \$7,000,486. *Id.* Allied's price was 218 percent higher than Monster's evaluated price. Applying the premium Allied imposes for monthly invoicing as required by the RFQ, Allied's price balloons to \$11,698,107 for CLIN 003 under the contract's five-year term, while Monster's price remains the same. AR 1026. This amount is more than \$8 million or 365 percent higher than Monster's price. AR 1026–28. In the Acquisition Summary and in the Notification and Basis of Award, the CO noted that if DOJ used the BPA at its maximum CLIN 0023 level of 115,000 employees, Monster's total price would be \$13 million. AR 1045, 1047. In contrast, Allied's total price would be approximately \$78 million if DOJ prepaid Allied's price annually. AR 592. Allied's total price would increase to more than \$112 million if DOJ invoiced monthly at the maximum CLIN level. AR 1026. Thus, under CLIN 0023, the difference between Monster's and Allied's prices is slightly less than \$100 million. Such a dras-

tic price difference precludes a finding of any prejudice to Allied. *See Analytical & Research Tech., Inc. v. United States,* 39 Fed. Cl. 34, 54 n. 19 (1997) (finding no prejudice where the protestor's price was 35 percent higher than the awardee's despite a violation of procurement laws); *Data Gen. Corp.,* 78 F.3d at 1563–64 (holding that the technical advantages of the protestor's proposal did not offset the difference in price).

The Court acknowledges that Allied's margin of technical superiority may have increased if the TEP had performed its duties properly. (Pl.'s Mot. 73.) Indeed, Allied's technical proposal may have been superior by as many as fourteen points in a properly performed evaluation. *Id.* at 21. However, any changes to the technical scoring in Allied's favor would not diminish the rationality of awarding the BPA to a qualified vendor whose price was significantly lower. This Court in *Electronic Data Systems, LLC v. United States* recently addressed the impact of a significant price difference under circumstances similar to this case. 93 Fed. Cl. 416 (Fed.Cl.2010). In that case, the Court held that despite the Government's error in failing to amend a solicitation, "a significant difference in price . . . can and often does preclude such a finding." *Id.* at 24 (citing *Data Gen. Corp.,* 78 F.3d at 1563; *Axiom Res. Mgmt., Inc. v. United States,* 78 Fed.Cl. 576, 590 (2007)). The Court reasoned that even if the disappointed bidder could have revised its proposal in light of the Government's errors, any such differences would have been inconsequential given the dramatic price difference "representing nearly a 29 percent spread." *Id.* at 23–24. The price difference in this case was much greater. Indeed, Allied's evaluated price was at least 218 percent higher than Monster's. Assigning a higher technical rating to Allied's proposal would not have overcome the staggering price difference. As Judge Allegra colorfully explained in *Electronic Data Systems,* the dramatic price difference "is the proverbial elephant in the parlor— and, strive as it might, plaintiff cannot squeeze that pachyderm out of the door." *Id.* at 23.

The CO reasonably considered the offerors' price difference in the Acquisition Summary, noting that "the price evaluation overwhelmingly favor[ed] Monster" and that "[t]here is no reasonable way to assert that Allied/Avue, receiving a technical score 5.04% higher than Monster justifies paying more than twice as much, resulting in millions of additional dollars over the five year term of the BPA." AR 1039. The record simply does not suggest that any DOJ errors reasonably could offset the price difference so as to make DOJ's selection improper. *See Data Gen. Corp.,* 78 F.3d at 1563; *see also Axiom Res. Mgmt. Inc.,* 78 Fed.Cl. at 590 (concluding that despite the apparent errors in the plaintiff's technical approach and past performance ratings, the awardee's lower price still trumped plaintiff's price); *Candle Corp. v. United States,* 40 Fed.Cl. 658, 665 (1998) (holding that even if the Government had complied with its legal obligations, the plaintiff's price still would have been considerably more expensive than the awardee's). The Court thus cannot find any prejudice to Allied from DOJ's technical evaluation.

### 2. *Technical Evaluation Report*

Allied also takes issue with the TEP's failure to create a consensus report as required in the PEP. (Pl.'s Mot. 59–61.) The PEP called for the TEP to prepare a draft technical evaluation report based upon the results of its initial review of the offerors' technical quotations. AR 18. The PEP provides that the report should contain "[c]omplete narrative assessments for all offerors, including the Strengths, Weaknesses, and Risks of each offeror relative to each Technical Evaluation Factor." *Id.* Allied argues that DOJ's failure to abide by its Acquisition Plan was arbitrary and capricious, and prejudicial to Allied. The Court does not agree.

 The PEP was an internal government document outlining the source selection process that DOJ would follow in awarding the ARS contract. AR 15. As previously discussed, source selection plans and other internal agency documents are guidelines that do not give any rights to offerors. *Manson Constr. Co.,* 79 Fed.Cl. at 19. Thus, DOJ's failure to follow its own internal plan

did not render its evaluation of the non-price factors arbitrary and capricious. Moreover, to the extent the agency did err in failing to draft such a report, Allied cannot show that it was prejudiced by the error in light of the drastically higher price in its quotation.

### 3. DOJ's Past Performance Evaluation Was Reasonable.

■ Allied alleges that DOJ failed to accord Monster's past performance proper weight, taking into account certain alleged security breaches in Monster's job application software. (Pl.'s Mot. 61–63.) Allied specifically points to three security breaches concerning Monster's automated system identified by one member of the TEP. AR 999. As previously discussed, the security incidents referenced were irrelevant to the evaluation of Monster's past performance because the incidents all involved Monster.com and had no relationship to Intervenor, Monster Government Solutions, or to its infrastructure or platform. See Def. Intervenor's Mot. 48–49; AR 1157–71.

■ Even if the security breaches somehow were related to Monster Government Solutions' system, Allied cannot demonstrate that it was prejudiced by the TEP's evaluation of past performance. In evaluating Monster and Allied under sub-factor three, Understanding of the Requirements, the TEP member's score sheet provides: "Neither [Allied nor Monster] provides security stats on any system breaches or PII compromises. Security is very important in IT and merits some mention." AR 1001. Both offerors received a negative mark in this regard. Id. Thus, contrary to Allied's assertion, the TEP member identified the security issue and reflected it in her score of Monster and Allied to the extent she felt appropriate. Since Allied cannot demonstrate any prejudice from the TEP's evaluation, the Court will not disturb it.

### F. DOJ's Best Value Determination

Allied argues that the CO conducted an improper best value determination by failing to evaluate overall cost in accordance with FAR 8.404(d), and by improperly averaging the TEP's technical evaluation scores. (Pl.'s Mot. 75–77.) Allied contends that when determining which offer "represents the best value," the procurement official also must include a "lowest overall costs analysis" as defined in FAR 8.404(d). Id. at 63. Allied similarly argues that the CO failed to exercise independent judgment in assessing the price and non-price factors of each offeror's quotation and also failed to document his best value determination adequately. Id. at 77–82.

#### 1. FAR 8.404 and 8.405

Allied asks the Court to consider whether an agency, when determining which offeror "represents the best value" in a FAR Subpart 8.4 procurement, must include as part of its evaluation a "lowest overall cost" analysis as defined in FAR 8.404(d). FAR 8.404 governs the activities of contracting officers when placing orders under the FSS pursuant to FAR 8.405. See FAR 8.404(a). FAR 8.404(d) provides:

> By placing an order against a schedule contract using the procedures in 8.405, the ordering activity has concluded that the order represents the best value (as defined in FAR 2.101) and results in the lowest overall cost alternative (considering price, special features, administrative costs, etc.) to meet the Government's needs.

FAR 8.404(d). Allied reads this provision to suggest that the agency, when making its best value determination, must consider the lowest overall cost, which requires the consideration of the base price, special features, and administrative costs, among other considerations. See Pl.'s Mot. 65. Allied argues that to read the lowest overall cost analysis as optional, ignores the "plain meaning of the test and nullifies an entire clause, leaving it meaningless." Id.

■ The Court need not determine whether Allied has offered a reasonable interpretation of FAR 8.404 because Allied has failed to demonstrate that it would have had a substantial chance of winning the award. Allied fails to point to anything in the administrative record to support its cost-saving contention. Nothing in Allied's quotation suggests that whatever cost-saving mecha-

nism its ARS product offered would have offset the $100 million price difference between Allied's and Monster's quotations. Allied simply cannot show that it would have received the award even if the agency had performed the analysis Allied requests. *See Data Gen. Corp.*, 78 F.3d at 1563–64 (holding that a protestor could not show prejudice where it made a business decision to offer an expensive system).

### 2. *DOJ's Best Value Determination Was Reasonable.*

Allied suggests that DOJ conducted a defective best value determination. (Pl.'s Mot. 75.) Procurement officials have substantial discretion in evaluating which proposal represents the best value to the Government. *Blackwater*, 86 Fed.Cl. at 514 (citing *E.W. Bliss Co.*, 77 F.3d at 449). Even when a solicitation emphasizes technical merit, an agency "may properly select a lower-priced, lower-technically-rated proposal if it decides that the cost premium involved in selecting a higher-rated, higher-priced proposal is not justified, given the acceptable level of technical competence available at the lower price." *Banknote Corp.*, 56 Fed.Cl. at 390 (citation omitted). The Court's main task is to ensure that the CO articulated a " 'rational connection between the facts found and the choice made.' " *Banknote Corp.*, 56 Fed.Cl. at 390 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted)). Thus, where agency officials reasonably exercise their discretion when conducting a best value analysis, the Court will not disturb the award. *See E.W. Bliss Co.*, 77 F.3d at 449. In other words, "[m]ere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious." *Blackwater*, 86 Fed.Cl. at 514 (citing *Banknote Corp.*, 56 Fed.Cl. at 384; *ABF Freight Sys., Inc. v. United States*, 55 Fed.Cl. 392, 409 n. 13 (2003)).

In conducting the best value determination, the Acquisition Plan provided that DOJ was "willing to pay a premium for a proposal with a greater technical rating." AR 4. However, in circumstances where quotations are considered "substantially technically equal," the Solicitation informed offerors that total evaluated price would be the deciding factor. AR 238. Thus, where [DOJ] determines that "the technical capabilities of two or more Offerors are not significantly different, ... the quote with the lowest evaluated price w[ould] be selected for award." *Id.*

In this case, the CO noted in the Acquisition Summary that he found Allied's proposal to be unacceptable based on the material exceptions it took to the RFQ. AR 1037. He nonetheless proceeded to evaluate Allied's business and price quote because the agency only received two quotations. *Id.* Averaging the ratings from the TEP evaluation and incorporating the past performance ratings, the CO assigned a total of 83.5 points to Allied and 79.49 points to Monster. AR 1038. The CO then drafted a spreadsheet comparing each offeror's prices by CLIN. *Id.* The CO noted in his price analysis that the Government would save approximately $3,796,135 for CLIN 003 if Monster were selected as the awardee. *Id.* The CO emphasized that the savings to the Government would increase if additional components of DOJ use this BPA. *Id.* The CO then acknowledged Allied's technical superiority but determined that the price evaluation "overwhelmingly favors Monster." AR 1039. The CO's source selection decision similarly notes that while Allied received a slightly higher technical rating, Monster proposed a "far lower overall price." AR 1033. Taking into account the substantial price difference, the CO awarded the BPA to Monster.

The Court finds that the CO's best value analysis reasonably considered the relative merits of Allied's and Monster's technical quotations. The Court further finds nothing arbitrary and capricious in DOJ's determination that Allied's quotation only had a slightly higher technical rating. *See Blackwater*, 86 Fed.Cl. at 514. The CO exercised independent judgment in finding that Allied's proposal was unacceptable and that even if it were acceptable, its technical superiority did not justify the higher cost. The RFQ directs the Government to select the quote with the lowest evaluated price where

the technical evaluations are substantially equal. In complying with the Solicitation, the CO reasonably made a business judgment to award the contract to the lower-cost offeror. *See WorldTravelService v. United States*, 49 Fed.Cl. 431, 441 (2001) (finding rational the agency's determination to award a contract to a lower-cost offeror despite a modest disparity in technical ratings); *ITT Fed. Serv. Corp. v. United States*, 45 Fed.Cl. 174 (1999) (noting that the language of the solicitation did not prohibit the procurement official from considering price before technical equivalence). The Court will not overturn DOJ's best value determination merely because Allied disagrees with the agency's analysis. *E.W. Bliss Co.*, 77 F.3d at 449.

### 3. *DOJ Adequately Documented Its Best Value Determination.*

██ Allied suggests that the CO failed to document his price analysis in accordance with the PEP, indicating that the CO failed to consider all aspects in conducting his best value determination. (Pl.'s Mot. 81.) To support its contention, Allied cites to FAR 8.405-2(e)(1)(4), which states that the ordering activity shall document "[t]he evaluation methodology used in selecting the contractor to receive the order." Allied's misplaced reliance on the PEP, an internal Government document, already has been addressed in this opinion.

In any event, the administrative record shows that the CO drafted an Acquisition Summary detailing the price difference between Allied's and Monster's proposals. AR 1038. Taking the price difference into account, the CO explained that Allied's slight technical advantage did not justify the additional cost. AR 1039. The CO similarly informed Allied in the Notification of Award, the Evaluation for Basis of Award document, and by e-mail that Monster offered more favorable pricing despite Allied's slight technical superiority. *See* AR 1045–47. The very purpose of FAR Part 8 is to provide a more simplified and flexible approach away from the "more formal and rigorous procedures for negotiated procurements." *Holloway*, 87 Fed.Cl. at 393; *see also Ellsworth*, 45 Fed.Cl. at 395 ("The purpose of the FSS

program is to provide federal agencies with a simplified process for obtaining certain goods and services."). In light of this "truncated procurement process," the Court views DOJ's documentation regarding its best value decision as adequate. *See Sys. Plus, Inc.*, 68 Fed.Cl. at 211.

For the reasons stated above, the Court finds that the CO's best value determination in awarding the contract to Monster was coherent and a reasonable exercise of his discretion.

### G. *Allied is Not Entitled to a Permanent Injunction.*

██ Injunctive relief is an extraordinary remedy, and should be granted only in limited circumstances. *Dyonyx*, 83 Fed.Cl. at 467; *see also Great Lakes Dredge & Dock Co.*, 60 Fed.Cl. at 369. The Court, however, may grant injunctive relief if the plaintiff establishes that: (1) it has succeeded on the merit s; (2) it would suffer immediate and irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff outweighs the harm to the Government if an injunction is granted; and (4) granting injunctive relief serves the public interest. *Id.* at 369 (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993)); *see also Al–Ghanim Combined Group v. United States*, 56 Fed.Cl. 502, 519–20 (2003). Having ruled that Allied has not succeeded on the merit s, the Court does not need to address the three remaining factors. Accordingly, Allied's request for a permanent injunction and declaratory judgment is DENIED.

### Conclusion

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's complaint for lack of subject matter jurisdiction is DENIED. Defendant's and Defendant–Intervenor's motions for judgment on the administrative record are GRANTED, and Plaintiff's cross-motion for judgment on the administrative record is DENIED. The Clerk is requested to enter judgment for Defendant. No Costs.

On or before June 9, 2010, the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential or other

 

protected information, and submit to the Court proposed redactions to this opinion, if any, before it is released for publication. The parties are requested to minimize their requested redactions so that the Court may publish as much of the decision as possible.

IT IS SO ORDERED.